UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TINA L. PHIPPS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:08-cv-0620-DFH-DML |
| | ) |
| MICHAEL ASTRUE, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

ENTRY ON JUDICIAL REVIEW

*Background*

Plaintiff Tina Phipps seeks judicial review of a final decision by the
Commissioner of Social Security denying her application for disability insurance
and supplemental security income benefits.   Acting for the Commissioner,
Administrative Law Judge ("ALJ") Albert J. Velasquez determined that Ms. Phipps
was not disabled under the Social Security Act because, in spite of reflex
sympathetic dystrophy in her dominant right arm, she retained the residual
functional capacity to perform light exertional work.  Ms. Phipps contends that the
ALJ erred by failing to consider the impact of her pain medications on her
condition and her ability to work, and by failing to articulate adequately his
assessment of her residual functional capacity and credibility.   As explained

below, the ALJ's decision is supported by substantial evidence and is therefore affirmed.

I.      *Medical Record*

On January 1, 2006, Ms. Phipps was roller skating when she fell onto her outstretched right wrist.  R. 200.  She sustained an intra-articular distal radius fracture.   She was examined by Dr. Brett Krepps, who recommended and performed surgery to insert a plate into her wrist to correct the fracture on January 2, 2006.  R. 201, 235-36.

When her cast was removed on February 14, 2006, Ms. Phipps began to cry in pain.  As Dr. Krepps applied persistent gentle motion to her forearm, he did not feel a firm block or end point to further supination, and she had no tenderness to palpation around her elbow or pain in her elbow.  She had no difficulty with pronation, although she had an expected amount of stiffness in her wrist.  R. 193. Dr. Krepps prescribed occupational therapy.  He explained to Ms. Phipps that her recovery was dependent on her compliance with therapy and that there was no anatomic reason to explain her lack of supination.  Dr. Krepps also discussed with Ms. Phipps his concern that she might develop a dependence on narcotic pain medication and that he would discontinue prescribing narcotics to her after a period of time.  R. 193-94.

Ms. Phipps' occupational therapy evaluation, dated February 16, 2006, noted that she had swelling and redness in the fingers of her right hand, and she could not move her fingers or turn her palm in an upward position.  R. 301. Carrie Stilwell, Ms. Phipps' occupational therapist, recommended that she attend therapy two or three times per week.  R. 296, 303.  At her March 10, 2006 appointment, Ms. Phipps reported that her pain medication had helped in decreasing her pain to a tolerable level, but she was unable to move her arm.  R. 295.  On May 1, Stilwell noted that Ms. Phipps had not attended therapy since April 4, 2006.  R. 271.  On June 8, 2006, Stilwell noted that Ms. Phipps had attended therapy once since her visit on May 11.   At that visit, Stilwell reemphasized that Ms. Phipps' attendance was necessary to see improvement.  R. 260.  At her July 10, 2006 visit, Stilwell noted that in the past month, Ms. Phipps had attended therapy four times and that her progress was minimal.  R. 254.

In the meantime, Ms. Phipps continued treating with Dr. Krepps.  At her February 24, 2006 and March 3, 2006 visits, he noted that her right wrist and hand were swollen and that she had difficulty with passive and active motion of her wrist.  R. 183, 187.  Dr. Krepps believed there was a good chance that she would get better given time and appropriate treatment.  R. 184.  At her March 27, 2006 visit, Dr. Krepps examined Ms. Phipps' right hand and arm and noted that the swelling around her wrist was greatly reduced, she seemed to have less pain with active and passive motion of her wrist, and rotation of her right forearm appeared less painful.  R. 179.  There were no significant skin color changes, her

incision had healed, and her wrist looked "much better."  *Id.*  Her x-ray showed that the positions of the distal radius and the plate and screws were excellent, and the fracture appeared to be healed.  He noted diffuse bone loss about the carpal bones, but it appeared less pronounced.  Dr. Krepps indicated that he wanted to arrange a sympathetic block for her right upper arm and that his office would attempt to secure that referral.  R. 180.

On April 20, 2008, Dr. David Tharp performed a right stellate ganglion block for Ms. Phipps' reflex sympathetic dystrophy of her right arm.  At the time, Ms. Phipps was unable to form a fist with her right hand, and she had difficulty with any movement of her right forearm, wrist, and hand.  R. 230.  When she returned for follow-up and a repeat block, Ms. Phipps reported definite improvement in her symptoms.  She remarked that the color in her right hand and wrist was much improved and her pain had decreased by about 25%, although she continued to have decreased flexibility and mobility and was unable to use her hand for daily activities such as writing and eating.  She had stopped any physical therapy.  R. 227.  Dr. Tharp encouraged Ms. Phipps to return to physical therapy.  R. 228.

On April 28, 2006, Dr. Krepps noted that Ms. Phipps' right hand had a bluish-reddish tint and showed increased hair growth on her right forearm and wrist.  She still reported feeling significant pain with passive motion of her wrist, and she had 70 degrees of passive forearm pronation and zero degrees of forearm supination without resistance and pain.  R. 173.  Her x-ray showed that there was

good alignment of the distal radius and her fracture appeared to be healed.  Dr. Krepps observed diffuse bone loss remaining around the distal radius and the carpal bones.  *Id.*

A CT scan taken of Ms. Phipps' right wrist showed that her fracture site was well-healed.  There was a vague lucency through one of the carpal bones of her hand, but it was noted that this was of questionable and probably relatively doubtful clinical significance.  R. 224.  The scan also revealed diffuse bone loss of the distal radius and bones of the wrist, probably related to disuse atrophy.  *Id.*

Dr. Krepps referred Ms. Phipps to Dr. Michael E. Pannunzio, a hand specialist, for his opinion.  At her May 15, 2006 examination, her chief complaint was right hand pain and stiffness with loss of forearm rotation.  R. 149-50.  She was in no distress, her fingers were warm, and her capillary refill was less than two seconds in each of her fingers.  She had no cyanosis, edema, rashes, or trophic changes, her skin was not shiny, and she did not have a woody, fibrotic appearance.  *Id.*  Dr. Pannunzio did not test her strength, but noted that Ms. Phipps had nearly full range of motion in her right shoulder with only mild stiffness at the extremes.  Her elbow range of motion showed full flexion and extension, 45 degrees of pronation, and 10 degrees of supination.  Her elbow was non-tender to palpation.  Her range of motion in her wrist was 20 degrees of flexion and 0 degrees of extension.  *Id.*  Dr. Pannunzio noted that the palm of Ms. Phipps' right hand was somewhat prominent radially, but her fingers did not make

cracking or popping sounds when bent in toward her palm, though her fingers were minimally tender when manipulated that way.  R. 150.

Dr. Pannunzio reviewed Ms. Phipps' CT scan and x-ray but found no fracture lines extending to her distal radial ulnar joint to explain her loss of forearm rotation.  Her "hardware" was in good position and none of the screws were prominent dorsally.  Her fracture appeared to be healed.  Dr. Pannunzio believed that Ms. Phipps suffered from a regional pain syndrome.  R. 150.

Ms. Phipps followed up with Dr. Krepps on May 22, 2006, who noted that she appeared to be in less pain and her range of motion seemed improved.  R. 165-66.

On May 31, 2006, Dr. Krepps wrote a letter on Ms. Phipps' behalf to the Social Security Administration.  R. 163.  He advised that Ms. Phipps had developed post-operative reflex sympathetic dystrophy, and that, in spite of treatment, she continued to have significant pain and limitation of motion and strength in her right upper extremity, although her strength and motion seemed to have been improving.  Dr. Krepps stated that, in his opinion, Ms. Phipps' pain level and right upper extremity function should continue to improve, although it might take 12 to 18 months to achieve maximum improvement.

Dr. Scott Taylor, a chronic pain specialist, examined Ms. Phipps on June 13, 2006. She told him that she had undergone extensive therapy with no relief of her pain. R. 219. At the time of her examination, Ms. Phipps was in no obvious physical distress, and Dr. Taylor noted that her right hand was swollen and the skin of her right hand was tight and shiny. Her surgical scar was well-healed. R. 219. She had limited flexion in her fingers, and she was very tender to flexion and extension of her right wrist. Her right elbow and shoulder were supple with a good range of motion. Her reflexes were easily elicitable, she had no nail bed pitting, and her capillary refill was intact. R. 219. Dr. Taylor renewed her prescriptions for Oxycontin, Lyrica, and Celebrex, and ordered a three-phase bone scan. R. 220. He suggested that she continue with her "aggressive" occupational therapy and continue trying to use her hand as much as possible. R. 220. Her bone scan revealed no significantly increased blood flow to her right wrist but showed diffusely increased blood flow and bone uptake in the wrist bone of her right hand. R. 222.

Ms. Phipps underwent another cervical sympathetic block on June 29, 2006, but this time the block did not improve her condition. R. 317-18. On July 21, 2006, Dr. Taylor pre-certified Ms. Phipps for a spinal cord stimulator. R. 317.

On July 11, 2006, Ms. Phipps told Dr. Krepps that the cervical sympathetic block had not improved her condition, and that in spite of her Transcutaneous

Electrical Nerve Stimulation (TENS") unit, she complained of significant pain.  R. 252.  Dr. Krepps also noted that Ms. Phipps' range of motion had not improved despite intensive hand therapy.   Ms. Phipps requested a refill of her pain medications.  Her hand was not swollen and her skin color was normal.  Her ability to move her wrist was slightly better, although her grip strength was slightly decreased on the right side compared to the left.  She was able to flex and extend her fingers without difficulty.  Dr. Krepps agreed to refill her Percocet prescription but warned her of the risk of dependence.  R. 253.

On January 16, 2007, Ms. Phipps was examined by Dr. Krepps.  Ms. Phipps shook his hand with her left hand instead of her right, and she seemed apprehensive about any passive motion of her wrist.  R. 246.  He noticed no trophic changes to her hand, such as discoloration or excessive sweating, and he believed her passive motion seemed improved.  He was able to passively supinate her forearm approximately 45 degrees and could pronate her forearm to approximately 80 degrees.  She seemed to have approximately 50 degrees of dorsiflexion and volar flexion.  Her fracture appeared to be completely healed, and an x-ray revealed improved bone density to her right wrist.  Dr. Krepps stated that Ms. Phipps was doing "reasonably well," although she continued to have symptoms from her reflex sympathetic dystrophy.  R. 247.

On July 20, 2007, Dr. Taylor submitted a medical form to the State of Indiana indicating that he believed Ms. Phipps was permanently disabled from RSD and that her prognosis with treatment was poor.  R. 325.

II.    *Testimony at the Hearing*

On July 10, 2007, Ms. Phipps testified before an ALJ.  At the time of her hearing, she was thirty-nine years old.  R. 35.  Ms. Phipps had a twelfth-grade education and had worked as a server (waitress and bartender) for over twenty years, until 2005.  R. 28.  She had two children.  One was living at home at the time of her hearing.  R. 29.  Ms. Phipps testified that she was unable to drive because of her medication.  R. 27.

She testified that she experienced pain as a tingling, burning, stabbing sensation.  R. 37.  At the time of her hearing, she took 150 milligrams of Lyrica twice a day, 200 milligrams of Celebrex twice a day, and 20 milligrams of Oxycontin three times a day.  R. 27-28.  She also used a TENS unit for pain control, although it did not help.  R. 30.  She testified that, beginning in June 2006, the reflex sympathetic dystrophy had radiated up her right arm into her left arm and had started attacking both of her legs.  R. 32.  The ALJ noted that he had not found documentation of leg pain in her legs, although she had had knee surgery.  R. 34.

A vocational expert, Constance Brown, also testified at the hearing.  Brown testified that a hypothetical individual of Ms. Phipps' age, education, and work experience who could lift and carry 20 pounds occasionally and 10 pounds frequently, who could sit or stand and walk for about six hours in every eight, but who was unable to kneel, to crawl, to climb ropes, ladders, or scaffolds, or to operate a motor vehicle, and who should avoid working at unprotected heights, around dangerous moving machinery, open flame, or near large bodies of water, and who was right-arm dominant but was unable to use her right arm in any capacity, could work as a reception or information clerk, a courier or messenger, or a mail clerk.  R. 35-36.  If the hypothetical individual was in so much pain or so fatigued that she was unable to work for two hours at a time, that person would not be able to work.  R. 37.

*Framework for Determining Disability and the Standard of Review*

To be eligible for the disability insurance benefits and supplemental security income she seeks, Ms. Phipps must establish that she suffered from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Ms. Phipps was disabled only if her impairments were of such

severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her in her immediate area, or whether she would be hired if she applied for work.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Ms. Phipps was disabled under the Social Security Act, the ALJ followed the familiar five-step analysis set forth in 20 C.F.R. § 404.1520 and § 416.920.  The steps are as follows:

(1)   Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

(2)   If not, did the claimant have an impairment or combination of impairments that are severe?  If not, she was not disabled.

(3)   If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)     If not, could the claimant do her past relevant work?  If so, she was not disabled.

(5)     If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. §§ 404.1520, 416.920.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

The ALJ found that Ms. Phipps satisfied step one.  She had not engaged in any substantial gainful activity at any time relevant to the ALJ's decision.  At step two, the ALJ found that Ms. Phipps had the following severe impairment:  right upper extremity reflex sympathetic dystrophy.  This impairment did not meet or equal any of the listings that would have automatically qualified Ms. Phipps for benefits at step three.  At step four, the ALJ determined that Ms. Phipps was no longer able to perform her past relevant work.

At step five, the ALJ determined that Ms. Phipps retained the residual functional capacity to perform light exertional work that did not require use of her right arm.  Based on the testimony of the vocational expert, the ALJ found that a person with Ms. Phipps' residual functional capacity would be able to work as an information or reception clerk, as a courier or messenger, or as a mail clerk or mail machine operator.  The ALJ therefore denied benefits.

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.  42 U.S.C. §§ 405(g), 1383(c)(3).  Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court.  42 U.S.C. §§ 405(g), 1383(c)(3); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions.  *Sarchet v. Chater*,

78 F.3d 305, 309 (7th Cir. 1996).  The ALJ's decision must be based upon consideration of all the relevant evidence, and the ALJ must articulate at some minimal level his analysis of the evidence so that the court can trace adequately the path of the ALJ's reasoning.  *Diaz*, 55 F.3d at 307-08.

*Discussion*

I.    *Consideration of Ms. Phipps' Pain Medications*

Ms. Phipps argues that the ALJ failed to properly apply Social Security Ruling 03-02p pertaining to proper evaluation of "cases involving reflex sympathetic dystrophy/complex regional pain syndrome."  SSR 03-02p, printed in 68 Fed. Reg. 59971-76 (Oct. 20, 2003).  In particular, Ms. Phipps contends that the ALJ failed to consider the effects of her chronic pain and her use of pain medications, as directed by SSR 03-02p:

> Chronic pain and many of the medications prescribed to treat it may affect an individual's ability to maintain attention and concentration, as well as adversely affect his or her cognition, mood, and behavior, and may even reduce motor reaction times.  These factors can interfere with an individual's ability to sustain work activity over time, or preclude sustained work activity altogether.  When evaluating duration and severity, as well as when evaluating RFC [residual functional capacity], the effects of chronic pain and the use of pain medications must be carefully considered.

Ms. Phipps argues that the ALJ failed to "factor into its RFC the impact on concentration, cognition, and reduced motor reaction time from Ms. Phipps's strong pain medications (Lortab and Oxycontin) which she testified to at the

hearing." Pl. Br. 6, citing R. 27-28. Ms. Phipps testified that she was unable to drive because of her medications, which included Lyrica, Celebrex, and Oxycontin, a fact considered by the ALJ. R. 17, 19; R. 27-28. Beyond her inability to drive, the record contains no objective evidence that these medications affected her concentration, cognition, or reaction time, and Ms. Phipps did not offer testimony or other evidence supporting her contention made on judicial review. The ALJ's failure to consider evidence that was not presented does not amount to error warranting remand.

II.   *Opinion of Dr. Taylor*

Dr. Taylor completed a form indicating that he believed Ms. Phipps was totally and permanently disabled. R. 325. Ms. Phipps argues that the ALJ erred by giving Dr. Taylor's opinion little weight. The ALJ considered Dr. Taylor's opinion but noted that "Dr. Taylor did not quantify the extent to which the claimant's work-related abilities have been compromised" and that Dr. Taylor's opinion did not correlate to the physical evidence. R. 19. The ALJ is charged with making the ultimate determination of disability. See 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Any medical opinion on which an ALJ relies in making that determination should be based on objective observations and should not "amount merely to a recitation of a claimant's subjective complaints." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Here, the ALJ assigned Dr. Taylor's opinion low probative value and clearly articulated his reasons for doing so. R. 19. According

little weight to Dr. Taylor's unsupported opinion in the face of contradictory objective evidence was not error.

Ms. Phipps argues that the ALJ also erred by failing to question Dr. Taylor regarding his opinion. Ms. Phipps bases her contention on SSR 03-02p, which directs an adjudicator to recontact a claimant's medical source where the evidence is inadequate to determine if the claimant is disabled or where there are conflicts in the medical evidence that must be resolved before a determination can be made. Pl. Br. 8; SSR 03-02p, printed in 68 Fed. Reg. 59971-76 (Oct. 20, 2003). Where the record evidence is sufficient and is sufficiently reliable to enable the adjudicator to make a determination without additional input, neither SSR 03-02p nor any other regulation requires an ALJ to recontact a medical source. Ms. Phipps has not shown any such inadequacy or conflict in the record. Although the ALJ gave little weight to the opinion because Dr. Taylor did not support it with any explanation of how he believed Ms. Phipps' work-related abilities had been compromised, as stated above, the ALJ (and not Dr. Taylor) is charged with making the ultimate determination of disability. See 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). The ALJ's failure to recontact Dr. Taylor to discuss his opinion regarding Ms. Phipps' disability was not error.

III.   *Residual Functional Capacity*

Ms. Phipps argues that the ALJ failed to explain properly his assessment of her residual functional capacity because, she argues, the ALJ did not perform a function-by-function assessment, failed to discuss her activities of daily living, and did not explain his rationale adequately.  Pl. Br. 9-11.  Ms. Phipps bases this argument on SSR 96-8p and contends that the ALJ failed to support his determination that she could work as an information or reception clerk, as a courier or messenger, or as a mail clerk or mail machine operator.  Pl. Br. 9.

The question here is whether the ALJ built an accurate and logical bridge between the evidence in the record and the result he reached.  *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).  The ALJ took into account that Ms. Phipps was unable to use her dominant right arm, to drive, or to operate heavy machinery in determining that she was capable of performing light exertional work not requiring use of her right arm.  R. 17-18.  Ms. Phipps did not offer any objective evidence suggesting that her limitations extended farther than that.[1]  Ms. Phipps also failed to offer any evidence of any restrictions to her activities of daily living other than her inability to drive, which the ALJ considered and took into account in evaluating her residual functional capacity.  R. 17.  She fails to support her

_____

[1]The ALJ considered but discounted Ms. Phipps' assertion, made for the first time at her hearing, that she also could not stand or use her left hand because her RSD had radiated into her left arm and legs.  R. 32.  Her testimony was unsupported by any other evidence in the record, and the ALJ did not consider her testimony to be credible.  R. 19, 34.  On judicial review of the ALJ's determination, Ms. Phipps does not argue that the ALJ's failure to consider the possibility that her condition was worsening and radiating into limbs other than her right arm was error, and the court need not consider that possibility on review.

argument that, contrary to the ALJ's conclusion, a person with her residual functional capacity could not work as an information or reception clerk, a courier or messenger, or a mail clerk or mail machine operator because of the specific requirements of those jobs.  Pl. Br. 9.  The ALJ's determination was supported by the objective medical evidence and was well articulated.  Ms. Phipps has failed to point out any lines of evidence that were available to but ignored by the ALJ. Based on this record, the court does not find error.

IV.    *Credibility*

Ms. Phipps argues that the ALJ committed error by failing to articulate his reasoning concerning his assessment of her credibility and that he failed to apply SSR 96-7p properly by failing to refer to her activities of daily living, failing to consider how outside physical stressors might aggravate her condition, and failing to discuss possible side effects of her pain medication.  Pl. Br. 12-14.  This argument also is not persuasive.

The ALJ is required to consider statements of the claimant's symptoms and how they affect her daily life and ability to work.  20 C.F.R. §§ 404.1529(a), 416.929(a).  However, neither the ALJ nor this court is "required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work."  *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996); accord, 20 C.F.R. §§ 404.1529(d), 416.929(d).  Instead, there is a two-part

test for determining whether a claimant's complaints contribute to a finding of disability.   First, the claimant must provide objective medical evidence of an impairment or combination of impairments that could be expected to produce the symptoms the claimant alleges.   20 C.F.R. §§ 404.1529(a)-(b), 416.929(a)-(b). Second, the ALJ must consider the intensity and persistence of the alleged symptoms.  The ALJ considers the claimant's subjective complaints in light of the relevant objective medical evidence, as well as any other evidence of the following factors:

(1)     The claimant's daily activities;

(2)     Location, duration, frequency, and intensity of pain or other symptoms;

(3)     Precipitating and aggravating factors;

(4)     Type, dosage, effectiveness, and side effects of any medication;

(5)     Treatment, other than medication, for relief of pain or other symptoms;

(6)     Other measures taken to relieve pain or other symptoms;

(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Having considered these factors, which are intended to either corroborate or discredit the claimant's subjective complaints, the ALJ may make a reasoned credibility determination based upon the evidence about whether the claimant

acts, day in and day out, like a person would act who is really suffering from the symptoms the claimant alleges.  It is not necessary for the ALJ to recite findings on each factor, but the ALJ must give reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers will have a fair sense of how the claimant's testimony was assessed.  See SSR 96-7p, printed in 61 Fed. Reg. 34483, 34486 (July 2, 1996); see also *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) (ALJ must comply with SSR 96-7p in making a credibility determination by articulating the reasons behind the determination).  The court will not set aside an ALJ's credibility determination if there is some support in the record unless it is "patently wrong."   *Luna*, 22 F.3d at 690; *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

Ms. Phipps testified that she is unable to use her right arm and that she is unable to drive.  The ALJ accepted these assertions and incorporated them into his finding of Ms. Phipps' residual functional capacity.  There was, therefore, no need for the ALJ to discuss her credibility on these points.  Ms. Phipps argues that the ALJ failed to consider her other activities of daily living, other physical stressors that might aggravate her condition, and any possible side effects of her pain medication.  However, Ms. Phipps failed to present evidence of the existence of any of these factors to the ALJ, and also fails to do so on review.  An ALJ may not ignore an entire line of evidence that is contrary to the ruling, see *Golembiewski v. Barnhart*, 322 F.3d 912, 917-18 (7th Cir. 2003) (remanding because ALJ improperly ignored three lines of evidence supporting plaintiff's

claim), but here the ALJ cannot be faulted for failing to consider evidence that simply did not exist in the record.  The court does not find error on this record.

### Conclusion

For the foregoing reasons, the court finds that the ALJ's decision denying benefits is supported by substantial evidence.  Accordingly, the decision is affirmed and final judgment will be entered.

So ordered.

Date: May 27, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Charles D. Hankey
charleshankey@hankeylawoffice.com, kew@hankeylaw.com

Tom Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov, wadlington@usdoj.gov, lin.montigney@usdoj.gov